**PRAIRIE STATES LIFE INSURANCE CO., Appellee,**

v.

**UNITED STATES of America, Appellant.**

No. 86–5082.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1987.

Decided July 17, 1987.

Nancy G. Morgan, Washington, D.C., for appellant.

David R. Brennan, Minneapolis, Minn., for appellee.

Before BOWMAN and WOLLMAN, Circuit Judges, and HANSON, Senior District Judge.[*]

BOWMAN, Circuit Judge.

Prairie States Life Insurance Company (taxpayer) is a stock life insurance company. Following an audit of taxpayer's returns for the years 1975 through 1978, the Internal Revenue Service assessed a deficiency. Taxpayer paid the assessed deficiency, and filed this suit for a refund and interest in District Court. The District Court, on cross-motions for summary judgment, ruled in favor of taxpayer on its claims that (1) certain distributions by taxpayer to its policyholders constituted "return premiums" under I.R.C. § 809(c)(1),[1] and that (2) with respect to a certain indemnity reinsurance transaction, taxpayer's 809(c)(1) income included only the tangible consideration received from the reinsured, and did not include an additional imputed amount equal to the excess of the statutory reserve liabilities transferred over the tangible consideration. *Prairie States Life Ins. Co. v. United States*, 639 F.Supp. 764, 767–69 (D.S.D.1985). The government appeals. For the reasons discussed below, we reverse.

## I.

Although taxpayer is a stock insurance company, it issues "participating" policies which, like the policies issued by mutual insurance companies, entitle the policyholders to participate in distributions from the annual divisible surplus of the company. For the tax years 1975 through 1978, taxpayer sought to treat certain of these distributions (or associated credits to policyholder accounts) as "return premiums," and to deduct the full amount of the distributions from taxpayer's gross operating

---

[*] The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. This and the other statutory provisions governing the taxation of life insurance companies were revised substantially by Title II, Section 211(a) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 720, but the revisions were not in effect during the tax years in question here. Accordingly, all citations to the Internal Revenue Code and to corresponding Treasury Regulations contained herein are to the versions in effect during the relevant years, unless otherwise noted.

income under I.R.C. § 809(c)(1). The Commissioner disagreed, arguing that the amount of the distributions was not "fixed in the [insurance] contract but depend[ed] on the experience of the company or the discretion of the management" and therefore that the distributions did not qualify as "return premiums" under Section 809(c)(1). I.R.C. § 809(c)(1). Instead, the Commissioner characterized the distributions as "dividends to policyholders" under I.R.C. § 811, and limited the amount of the deductions in accordance with I.R.C. § 809(f). As noted above, the District Court rejected the Commissioner's position, and accepted taxpayer's characterization of the distributions as "return premiums." 639 F.Supp. at 767. Understanding the import of this characterization requires some background in the method by which life insurance companies' taxable income is computed.

Under the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69, § 2(a), 73 Stat. 112 (1959) (the 1959 Act), Congress broadened the bite of the corporate income tax on the income of life insurance companies. Basically, the 1959 Act was designed to tax insurance companies on both underwriting income and investment income,[2] rather than solely on investment income as under previous law. *See generally*, S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.Code Cong. & Admin.News 1575 (S.Rep. Reprint).

The 1959 Act divides a life insurance company's earnings into three parts or phases, and includes those phases in the company's taxable income according to a complex formula. The resulting taxable income is taxed at standard corporate income tax rates. The two most important components of this formula are the company's investment income and the company's gain from operations. Taxable investment income is net income from investments less any amounts required to be set aside for policyholders. I.R.C. § 804(a)(2). Gain from operations consists of net income from all sources, including both investment and underwriting income, and capital gains, if any. I.R.C. § 809(b).

The Code defines Phase I income as the lesser of investment income or gain from operations. If there are underwriting losses, these losses are netted against investment income in determining gain from operations. I.R.C. § 802(b)(2). Thus, because the lesser of investment income or gain from operations is used in determining Phase I income, the effect of any net losses incurred in the company's underwriting operations is to reduce Phase I income. If gain from operations exceeds investment income (i.e., if there are net earnings from the company's underwriting operations) the excess income is taxed under Phases II and III. I.R.C. §§ 802(b)(2) & (3).

Congress viewed the difference between gain from operations and investment income as a rough approximation of net underwriting income, and hence Phases II and III were intended to include the company's underwriting earnings in the corporate income tax base. S.Rep. Reprint at 1581. Under Phase II, one-half of this underwriting income is included in the company's taxable income. I.R.C. § 802(b)(2). The remainder of the underwriting income is taxed under Phase III, and is included in the company's taxable income only when it is actually distributed to or specially reserved for shareholders. I.R.C. § 802(b)(3).

As noted above, when there are underwriting losses, Phase I income is reduced by the amount of those losses, and in such years Phase II does not apply. Hence, underwriting operations not only determine the amount, if any, of underwriting income subject to tax, but also may have an impact on tax liability for investment income as well.

The major component of underwriting income is insurance premiums, which

---

**2.** In simple terms, underwriting income consists of earnings associated with the receipt of premium payments on insurance policies, less the expenses associated with selling the policies and administering claims thereon. Investment income consists of net earnings resulting from investments, in excess of any investment earnings allocated to policyholders under separate statutory provisions.

§ 809(c)(1) defines as gross premiums less "return premiums" and certain payments in connection with reinsurance. Return premiums therefore reduce the amount of underwriting income, and may even generate underwriting losses by reducing premium income to an amount below the level of corresponding underwriting expenses. In years when return premiums generate underwriting losses, their effect also is to reduce the tax liability for investment income, since underwriting losses are offset against investment income in determining Phase I income.

■ Distributions or credits to policyholders which do not constitute "return premiums" are treated as "dividends to policyholders." *American National Ins. Co. v. United States*, 690 F.2d 878, 882 (Ct.Cl.1982); Treas. Reg. § 1.811–2(a). Under I.R.C. § 809(d)(3), these dividends to policyholders may be deducted from the company's operating income, subject to an important limitation: under Section 809(f), the amount of dividends deducted may not exceed the amount by which the gain from operations (before dividend deductions) exceeds taxable investment income, plus $250,000.

It follows that in years when there is no gain from operations, the deductibility of dividends to policyholders is limited to $250,000. However, as noted above, the Code places no such limit on the extent to which return premiums may be deducted. As a result, in years when amounts distributed to policyholders are more than $250,000 greater than the excess of gain from operations over taxable investment income, the characterization of the distributions as return premiums or dividends will have an impact on the insurance company's overall tax liability. In the present case, taxpayer argues that we should characterize the distributions in question as return premiums, thus allowing taxpayer to reduce its Phase I tax liability by more than would be permitted if the distributions are characterized as dividends.

Section 809(c)(1) defines return premiums negatively, specifying that "amounts returned where the amount is not fixed in the

contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums." I.R.C. § 809(c)(1). Thus, the characterization of taxpayer's distributions under its participating policies depends upon whether the amounts distributed were "fixed in the contract," in which case they are return premiums, or "depend[ed] on the experience of the company or the discretion of the management," in which case they are dividends. As one court has suggested, the statutory language represents "opposite sides of the same coin." *American National*, 690 F.2d at 886.

The court below determined that "[t]he dividend scales employed by [taxpayer] were not part of the insurance contract," and that "the contract did not fix the amount of the dividends." 639 F.Supp. at 766. However, citing *American National* for the proposition that *de minimis* management discretion does not disqualify a distribution as a "return premium" under Section 809(c)(1), the District Court also determined that "[t]he constraints placed upon [taxpayer] by the [state insurance commissioner] and well established industry standards allowed no more practical discretion than possessed by the *American National* [p]laintiff." 639 F.Supp. at 767. Under the District Court's view of the law, the latter determination supported the court's conclusion that the distributions in question were return premiums. We believe, however, that the court's reading of the statute was erroneous, and that the practical limits on taxpayer's discretion in making these distributions are not legally sufficient to meet the statutory definition of return premiums.

Relying on the legislative history of the 1959 Act and on the discussion in *American National*, the District Court concluded that "[t]he dispositive question is whether the payments here constituted distribution of excess or redundant premium income, or income earned by the Plaintiff through its investments." 639 F.Supp. at 767. The court therefore concluded that "[t]he only equitable and appropriate solution [was] to permit the United States to assess tax on

investment income returned to policyholders by classifying it as dividends, and permit Plaintiff to deduct the return of excess premiums by classifying them as return premiums." *Id.* Although the District Court correctly discerned the legislature's intent, we believe the court overlooked the legislative solution to the characterization issue, a solution which is contained within the four corners of the statute.

The statutory scheme is unambiguous and straightforward. Section 809(f) essentially treats all distributions to policyholders as a return of excess premium income, and the distributions are therefore deductible, but only to the extent of underwriting gains, plus $250,000. Congress determined that once underwriting gains are fully distributed, the presumptive treatment of amounts distributed to policyholders as a return of excess premium income is no longer warranted. Hence, after the first $250,000, all distributions in excess of underwriting gain are presumed to be a distribution of investment income, and are not deductible. As observed by the Court of Claims in *American National*, "there was nearly unanimous agreement [in Congress] that the return of 'redundant' (also called 'excess,' 'overcharge,' etc.) premiums was a return of capital to the policyholder that should not be taxed," but it is equally clear that "despite the opposition of the mutual insurance companies, Congress viewed the portion of policyholder dividends derived from investment earnings as income properly taxable to the insurance company." 690 F.2d at 883 (citations omitted). Under the statutory scheme it is immaterial that the funds available for distribution may be traced directly to excess loading in premium charges; except for the first $250,000, there must be net underwriting income from which to make the distributions. If there is no underwriting income, the amounts distributed to policyholders must be treated as dividends and may not be deducted as return premiums.

The one exception to this general rule is found in Section 809(c)(1), which allows for the unlimited deductibility of return premiums where the amount of the return is contractually fixed, and does not depend upon management discretion or company experience. In this section, Congress recognized that insurance companies may be contractually bound to make certain returns to policyholders. *See American National*, 690 F.2d at 884–85; *see also* S.Rep. Reprint at 1629; *Republic National Life Ins. Co. v. United States*, 594 F.2d 530, 535–36 (5th Cir.1979). Hence, even in years when a company has little or no underwriting gain, certain fixed payments to policyholders may be compulsory, and may generate underwriting losses—and a corresponding reduction of taxable investment income—in excess of the $250,000 limit contained in Section 809(f).

■ That this exception is limited to those payments actually fixed in a legal sense, and does not apply to those payments that are dependent upon the insurance company's earnings experience or management discretion, is clear from the statutory language.[3]

---

3. Even if the statute left any room for doubt, the legislative history is quite explicit on this point. During the House consideration of the 1959 Act, the Chairman of the Ways and Means Committee responded to questions regarding the proposed treatment of policyholder dividends. The Chairman's remarks demonstrate that Congress was aware of, and attempted to address in the statute itself, the tax treatment of distributions to policyholders that were in part a return of excess premium and in part a distribution of investment earnings:

The bill has the effect of recognizing two elements in the policy dividends. A part of the dividend is a distribution of profits earned from dealing with third parties. Part of it is a return to the policyholder of an excess premium that the same policyholder was required to contribute when he joined the mutual organization. The bill operates so that a distribution of policy dividends cannot reduce the tax on free investment income provided by phase 1. The bill does provide that policyholder dividends can be deducted against any extra underwriting income in phase 2 but they cannot generate an underwriting loss that would reduce the taxable investment income under phase 1. In effect, if the dividend is out of the free investment income, then there is no deduction; if it is a return of extra premiums—that is, if it is out of the premium income itself—then there is a deduction.

105 Cong.Rec. 2567–68 (1959). Similarly, in response to specific questions regarding the op-

Accordingly, the dispositive issue in this case is not, as the District Court thought, whether the source of the payments was premium income or investments. Rather, the issue is whether the distributions here fit within the narrow exception to the general rule—whether the amounts were "fixed in the contract" or dependent upon "the experience of the company or the discretion of the management." I.R.C. § 809(c)(1). The District Court determined that "[t]he dividend scales employed by [taxpayer] ... were not part of the insurance contract. Moreover, the contract did not fix the amount of dividends." 639 F.Supp. at 766. These determinations are clearly correct, and they effectively resolve the legal issue before us.

Taxpayer's reliance on *American National*, 690 F.2d at 878, and *Republic National*, 594 F.2d at 530, is misplaced. In both of these cases, the courts found that the policies in question contractually fixed the amounts of distributions to policyholders, and that the companies were obligated under the contracts to make the distributions. In *American National*, the court found that experience rating refund agreements sufficiently fixed the amount of the plaintiff's distributions to meet the definition of return premiums. 690 F.2d at 885–86. This was true even though the agreement did not specify every detail of a formula for an unreported claims reserve (to be deducted from the rating refunds), and even though the company had in a few isolated instances changed the percentage of excess premiums to which certain policy-

holders were entitled. *Id.* at 885. In *Republic National*, the Fifth Circuit decided that the Section 809(c)(1) reference to "experience of the company" referred to the insurer, rather than the insured, and the court therefore characterized as return premiums certain refunds based on the claims experience of the company's policyholders. 594 F.2d at 533–36. It was, however, clear that the obligation to distribute the refunds (in an amount based on the insured's claims experience) was fixed in the contract with the insured. *Id.* at 534.

█ In this case, taxpayer's participating policies entitled the policyholders to "participate in the divisible surplus" of the company, but only "as determined and apportioned" by taxpayer's management. *See, e.g.*, Snortland Affidavit Exhibit 1 at 3. The amount of such payments therefore is not fixed by the insurance contract, and policyholders have no legally enforceable right to receive any such payments. Deposition Exhibit D at 7. The policies were sold with the aid of projected "dividend scales," which were used by taxpayer's agents to project amounts that policyholders could expect to receive under the participating provisions. According to taxpayer, its actuary computed the "actual premium" charges necessary to administer claims on the policies, and then added "excess" premium charges sufficient to cover these dividend scales. Brief of Appellee at 4. It is uncontested that the charts showing the dividend scales clearly stated that the divi-

eration of the return premium clause, the Chairman stated:

   What we are trying to do in this for the purpose of step [phase] 2 is to permit an absolute deduction for refunds to policyholders if there is a contract with the policyholder to refund some definite amount; but if amounts are refunded that are not fixed in the contract these will not be included as return premiums. These contingent amounts will not be treated as an absolute deduction but they will be treated as dividends to policyholders. They can only be deducted against the excess of total income over taxable investment income.

   \*     \*     \*     \*     \*     \*

   In the bill we are saying that you will not be able to return a part of the investment held

free of tax. We are saying, however, that you can return out of any net operating gain any excess loading in connection with the fixing of the premium or in what might otherwise be known as underwriting gains. That can be done by a stock company; that can be done, of course, by mutual companies. *But we would not ... permit a company to avoid the payment of a tax on its investment yield simply because the company had said in a contract with a policyholder that it wanted to or intended to refund to the policyholder some of that investment yield.*

*Id.* at 2573–74 (emphasis added). There is similar language in the Senate Report. *See* S.Rep. Reprint at 1584–85, 1596–97, 1629–32.

dend amounts were estimates only and could not be guaranteed.

Taxpayer argues that insurance industry standards, the threat of regulatory action by the state insurance commissioner, and its "moral obligation" to make payments in accord with the dividend scales constituted a binding obligation to make the projected dividend payments. From a business standpoint, this type of obligation may be binding in the same sense that a corporation often feels an obligation to pay annual dividends on its outstanding common shares in order to maintain the market value of the shares. In both cases, management's discretion is fettered by business considerations that may be quite compelling, but such considerations clearly do not represent the type of legal obligation Congress envisioned in allowing unlimited deductions for obligatory return premiums.

Taxpayer concedes that it made payments to participating policyholders pursuant to the dividend scales in years when it experienced underwriting losses. To refer to the dividend scales payments as "excess" or "return premiums" in such years is to ignore fiscal reality. Despite taxpayer's repeated contentions that these distributions constitute "excess" premium charges and are derived directly from premium rather than investment income, it must be remembered that treatment of these payments as "return premiums" would generate underwriting losses for use in offsetting investment gains and in reducing Phase I tax liability. Taxpayer thus is seeking a tax deduction for payments to its participating policyholders that it was not legally obligated to make during years when the effect of the payments was to generate more than $250,000 in underwriting losses. This does not comport with the clear terms of the statute. Because the amount of dividend scale payments made pursuant to the participating policies was not contractually fixed, the payments do not qualify as return premiums, and we reverse the judgment of the District Court treating them as such.

We also decline to accept taxpayer's alternative argument that payments made pursuant to similar participating policies originally written by Perpetual National Life Insurance Company constituted return premiums. Under an assumption reinsurance contract with Perpetual, taxpayer agreed to "maintain [Perpetual's] business in a proper and lawful manner in accordance with the laws of the State of South Dakota." Brief of Appellee at 8. According to taxpayer, this language and a related oral understanding with the South Dakota Insurance Commissioner (who approved the assumption transaction) legally obligated taxpayer to make the dividend scales payments on the Perpetual policies, thus qualifying those payments as return premiums.

Taxpayer's contention presents a nice question as to whether the "fixed in the contract" language of Section 809(c)(1) properly can be applied to an assumption agreement, rather than solely to the underlying policy contract on which dividends are paid. However, we need not address the question here. An obligation to continue making dividend scales payments in accordance with the terms of participating policies draws its meaning from the language of those policies. We already have held that similar language in taxpayer's own policies did not establish a duty to pay dividends, or to pay them in any particular amount, and because that language thus did not meet the test of Section 809(c)(1), the same conclusion applies to the policies assumed from Perpetual.

Despite taxpayer's oral understanding with the South Dakota Insurance Commission regarding the continued payment of dividends on the Perpetual policies, the Commission's Chief Examiner admitted that there was "no specific statutory action [the Commission] could take" to require payments according to the dividend scales. Graham Deposition at 11. Rather, the Commission depends upon its influence with insurance companies, and upon its general authority as the regulatory agency overseeing insurance business within the state, to pressure a company to continue paying dividends on its participating poli-

cies. However, it is clear from the Chief Examiner's deposition that although the continued payment of dividends according to the Perpetual dividend scales was expected, the Commission would allow the reduction of such payments if taxpayer's financial position made such payments fiscally unsound. *Id.* at 19. This regulatory flexibility is sufficient for purposes of the "experience of the company" language of Section 809(c)(1), and we therefore hold that the payments on the Perpetual participating policies must be classified as dividends to policyholders rather than return premiums.

## II.

The second issue for our resolution involves the tax treatment of an indemnity reinsurance transaction undertaken by taxpayer in 1978. Pursuant to an agreement with General Security Life Company (General Security), taxpayer reinsured a block of paid-up life insurance policies originally underwritten by General Security. The agreement provides for taxpayer's assumption of the liabilities of General Security with respect to the policies reinsured. Snortland Affidavit Exhibit 2. However, taxpayer and the government agree that the arrangement constituted an indemnity reinsurance transaction, as opposed to an assumption reinsurance transaction.[4] As consideration for the reinsurance provided, General Security paid taxpayer an amount equal to 80 percent of the statutory reserves required on the policies. *Id.* Taxpayer included this payment, which amounted to $849,751, in its 1978 gross

income. Taxpayer then established the statutory reserves required on the liabilities assumed, and, pursuant to I.R.C. § 809(d)(2), deducted from its gross income the full amount of the statutory reserves so established. Because the required reserves on the policies reinsured totalled $1,062,189, the net effect of the transaction was to generate an immediate tax loss of $212,438 for the 1978 taxable year.

The Commissioner refused to accept taxpayer's position, arguing instead that taxpayer should be treated as having received consideration from General Security in an amount equal to the statutory reserve liabilities assumed, and as having paid back to General Security a ceding commission equal to the $212,438 excess of statutory reserves over the $849,751 actually paid by General Security to taxpayer. The Commissioner then determined that the imputed $212,438 ceding commission should be treated as an amount expended to acquire an intangible asset with an income-producing life extending substantially beyond the current taxable year. Accordingly, the Commissioner required taxpayer to amortize the ceding commission over a period of five years.[5]

The District Court, relying upon *Security Benefit Life Ins. Co. v. United States,* 726 F.2d 1491 (10th Cir.1984), and *Mutual Savings Life Ins. Co. v. United States,* 488 F.2d 1142 (5th Cir.1974), rejected the Commissioner's attempt to impute additional income to taxpayer, and held that taxpayer was required to report as income only the $849,751 actually paid by General Security. 639 F.Supp. at 768–69. It was undisputed,

---

**4.** In assumption reinsurance, the reinsurer becomes directly liable to the policyholders for the liabilities and risks it has assumed. Indemnity reinsurance differs from assumption reinsurance in that the reinsurer, although assuming the liabilities of the reinsured, does not become primarily liable to the policyholders. Indemnity reinsurance includes both conventional coinsurance, in which the reinsurer establishes reserves to cover its portion of the liability assumed, and modified coinsurance, in which the reinsured continues to carry the reserves on its own books. *See generally Beneficial Life Ins. Co. v. Commissioner,* 79 T.C. 627, 629–35 (1982). In this case, although taxpayer "assumed" all the liabilities of General Security under the policies

and established its own reserves, the policyholders were not informed of the reinsurance agreement. General Security remained primarily liable to the policyholders and continued to process claims and pay benefits as required. Brief of Appellee at 9. Accordingly, the reinsurance agreement with General Security is a conventional coinsurance arrangement in the form of an indemnity reinsurance transaction.

**5.** The Commissioner seeks to have the $212,438 ceding commission amortized over a five-year period as a "conservative approximation of the useful life of the indemnity reinsurance transaction." Brief of Appellant at 30 n. 19.

and the court correctly recognized, that taxpayer was entitled to deduct immediately the entire amount of the $1,062,189 statutory reserve established as a result of the reinsurance liabilities assumed.[6] *Id.* at 769.

Section 809(c)(1) requires life insurance companies to include in their income all "premiums and other consideration (including ... consideration in respect of assuming liabilities under contracts not issued by the taxpayer)." In the case of assumption reinsurance, the tax treatment of the transaction is governed explicitly by Treas.Reg. § 1.817–4(d).[7] That regulation specifically covers transactions similar to the one in this case, "where the reinsured transfers to the reinsurer in connection with [an] assumption reinsurance transaction a net amount which is less than the increase in the reinsurer's reserves resulting from the transaction." Treas.Reg. § 1.817–4(d)(2)(iii) (as amended in 1976). For such cases, the regulation adopts the position urged by the Commissioner here: the reinsurer is treated under Section 809(c)(1) as "[h]aving received from the reinsured consideration in an amount equal to the net amount of the increase in the reinsurer's reserves resulting from the transaction," Treas.Reg. § 1.817–4(d)(2)(iii)(A) (as amended in 1976), and then as having paid back to the reinsured a ceding commission in an amount "equal to the excess of the ... increase in the reinsurer's reserves over the net amount received from the reinsured," Treas.Reg. § 1.817–4(d)(2)(iii)(B) (as amended in 1976).

The regulation provides specific examples, one of which applies the principles of the regulation to a fact pattern closely resembling the one in this case:

*Example 3.* The facts are the same as in Example (1) [on June 30, 1959, Y, a life insurance company, assumed a block of insurance contracts from X, the reserves on which were $100,000. X agreed to pay Y $100,000 for assuming the contracts and Y agreed to pay X $17,000 for the future benefits flowing from the assumed policies], except that the reinsurance agreement does not specifically provide that X agreed to pay Y $100,000 for assuming the contracts reinsured and Y agreed to pay X $17,000 for the right to receive future premium payments under such contracts. Instead, X agreed to pay Y a net amount of $83,000 in cash for assuming such contracts. Nevertheless, Y is treated as having received from X consideration equal to $100,000, the amount of the increase in Y's reserves, and as having paid $17,000 ($100,000 less $83,000) for the purchase of such contracts. Therefore, for the taxable year 1959, Y has income of $100,000 under section 809(c)(1). Y also has a deduction of $100,000 under section 809(d)(2) for the net increase in its reserves and an amortization deduction under section 809(d)(12) of $1,000 ($17,000 divided by 17, the reasonably estimated life of the contracts reinsured). The remaining $16,000 shall be amortized by Y over the next 16 succeeding years at the rate of $1,000 for each such year.

Treas.Reg. § 1.817–4(d)(3) (*Example (3)*) (as amended in 1976). The transaction set forth in the example might best be described as an "imputed netting" transaction. The regulations treat the transaction as two separate exchanges, involving consideration flowing in each direction, even though the contract between the parties describes only the net amount of consideration paid by the reinsured to the reinsurer. The result of the regulation is to treat the reinsurer as having received both tangible

---

6. The District Court's opinion analyzes the deductibility of the statutory reserve amount in terms of Section 809(c)(1), rather than Section 809(d)(2). Although the court referred to the wrong section, its holding recognizing the deductibility of taxpayer's increase in statutory reserves was correct, and the government does not contend otherwise.

7. The placement of the regulation under Section 817, which deals with capital gains and losses, derives from a transitional rule applicable to assumption reinsurance transactions undertaken through December 31, 1958. *See* I.R.C. § 817(e) (1959). Following the expiration of that transitional rule, the Code left open the tax treatment of such transactions, and the regulation is intended to govern transactions after December 31, 1958.

assets (as applied to the present case, the $849,751 in cash) and an "additional amount of consideration for the intangible value of the policies" transferred (in this case, the $212,438 excess of the increase in taxpayer's reserve over the tangible consideration received from General Security). *Oxford Life Ins. Co. v. United States*, 790 F.2d 1370, 1374 (9th Cir.1986). Relying on principles announced in *Commissioner v. Tufts*, 461 U.S. 300, 306, 313, 103 S.Ct. 1826, 1830, 1834, 75 L.Ed.2d 863 (1983), *United States v. Davis*, 370 U.S. 65, 72, 82 S.Ct. 1190, 1194, 8 L.Ed.2d 335 (1962), and *Crane v. Commissioner*, 331 U.S. 1, 14, 67 S.Ct. 1047, 1054, 91 L.Ed. 1301 (1947), the Ninth Circuit in *Oxford* reasoned that the amount of assets transferred in an arms-length transaction between reinsurer and reinsured had to be equal to the amount of liabilities assumed. *Oxford*, 790 F.2d at 1374. Accordingly, the court upheld the Commissioner's application of the regulation to an assumption reinsurance transaction involving, as in the present case, a transfer of statutory reserve liabilities in excess of the cash consideration paid. *Id.* at 1373–74.

Taxpayer contends that no such "imputed netting" is justified here and that its income from the General Security reinsurance transaction must be limited to the $849,751 paid to it by General Security. In support of its contention, taxpayer makes two basic arguments. First, taxpayer argues that because the reserve liability requirements are established by state law and are determined under extremely conservative actuarial assumptions, the value of the required statutory reserves is an artificially high measure of the liabilities assumed. According to taxpayer, if more reasonable mortality and interest rate assumptions are employed, the true economic liabilities assumed under the reinsured policies would be equal to the tangible consideration received from General Security. In other words, taxpayer seeks to apply the *Tufts*, *Davis*, and *Crane* principles by equating the tangible consideration received from the reinsured with the liabilities assumed. Relying on similar reason-

ing in *Security Benefit*, 726 F.2d at 1491, the District Court accepted taxpayer's argument. 639 F.Supp. at 768. Accordingly, the court held that taxpayer had taxable income of only $849,751 on the reinsurance transaction.

We disagree with that result. From an actuarial standpoint, it may well be true that the reserves required under a state's conservative statutory assumptions exceed the true economic liabilities reflected in the underlying policies. In this sense, the statutory reserves might be said to be artificially high. However, there is nothing artificial or unreal about the statutory reserve obligations transferred to taxpayer, nor about the assets required to be set aside in establishing the reserves. More significantly, there is nothing artificial about the Section 809(d)(2) tax deduction generated by the resulting increase in taxpayer's total reserves, nor about the residual value taxpayer expects to receive upon the maturation of the underlying policies.

The block of reinsurance acquired by taxpayer has positive economic value precisely because the required reserves exceed the true economic liabilities on the underlying policies. There are no further premium payments due on the policies; any future income will be generated solely from the existing reserve fund. As the policies mature and benefits are paid, or as General Security recaptures the policies as permitted by the reinsurance contract, taxpayer will be able to reduce the reserves required to cover the remaining liabilities. If taxpayer's assertion regarding the true extent of the liabilities is correct, these reduced reserve requirements will more than offset the benefit payments on the policies retired, and there will be excess funds remaining in the reserve when all of taxpayer's obligations with respect to the reinsured policies have been fully performed.

■ This present expectation of future excess reserve value is an intangible asset to taxpayer, and is presumably one of the primary reasons why taxpayer undertook the reinsurance transaction. *Modern*

*American Life Ins. Co. v. Commissioner,*[8] 830 F.2d 110, 112 (8th Cir.1987) (excess of statutory reserve liabilities assumed over net consideration received "represents the present value of the acquired policies") (dicta). If we were to accept the District Court's analysis, the result of including only $849,751 in taxpayer's Section 809(c)(1) income, but allowing (as the government concedes we must) taxpayer to deduct the full $1,062,189 for its increase in reserves under Section 809(d)(2), is to allow taxpayer an immediate net deduction of $212,438 for the acquisition of a valuable intangible asset with a life extending substantially beyond the current taxable year. Such a result is legally insupportable. *See* Treas.Reg. § 1.461–1(a)(1); *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 12, 94 S.Ct. 2757, 2764, 41 L.Ed.2d 535 (1974); *Wells-Lee v. Commissioner,* 360 F.2d 665, 669–70 (8th Cir.1966). We therefore decline to accept the argument that because the conservative statutory reserve requirement exceeds the more realistic actuarial measure of the liabilities assumed, taxpayer should not be treated as having received consideration equal to the statutory reserve liability so assumed.

Taxpayer's second argument is that imputed netting is applicable only to assumption reinsurance transactions, and does not apply to the indemnity reinsurance transaction undertaken here. Taxpayer's argument is not entirely without merit, because Treas.Reg. § 1.817–4(d)(2)(ii) by its terms applies only to assumption reinsurance transactions. Moreover, the definition of assumption reinsurance, contained in Treas.Reg. § 1.809–5(a)(7)(ii), specifically excludes indemnity reinsurance. We therefore agree with taxpayer that Treas.Reg. § 1.817–4(d) does not dictate the treatment of this type of transaction.

■ However, the inapplicability of the regulation to taxpayer's indemnity transaction does not mean that the transaction is not governed, under the applicable statutory provisions, by principles similar to those illustrated in the regulation. By its exclusion of indemnity reinsurance transactions, the regulation does not prescribe a different tax treatment for such transactions. Rather, the regulation is silent as to their treatment, and we must look to the statutory language and to other regulations in deciding how to treat indemnity transactions. We adopt the approach employed by the Tax Court in *Beneficial Life Ins. Co.* and hold that, for purposes of computing Section 809(c)(1) income in an indemnity transaction, the consideration received equals the full amount of the reserve liability assumed. 79 T.C. at 644–45. This approach recognizes that the statutory reserve liabilities assumed by taxpayer are, for tax purposes, in no way artificial, and that under *Tufts, Davis,* and *Crane,* taxpayer must be deemed to have received from General Security consideration in an amount equal to the liabilities so assumed.

Taxpayer refers us to *Mutual Savings,* 488 F.2d at 1142, and to *Security Benefit,* 726 F.2d at 1491, but both of those cases involved assumption reinsurance transactions, and applied a prior version of Treas. Reg. § 1.817–4(d). To the extent that *Security Benefit* may be read to hold that Section 809(c)(1) requires the reinsurer in an indemnity transaction to report only the fair market value of the tangible assets received, we decline to follow that case. In our view, it is clear that taxpayer has received from General Security not only the $849,751 in tangible consideration, but, as discussed above, intangible consideration consisting of the present value of the acquired block of policies. As a result, we hold that taxpayer must be treated as having received additional consideration of $212,438 and as having paid to General Security a ceding commission in an equivalent amount.

---

8. An opinion in *Modern American* was issued by a panel of this Court on May 13, 1987, and was initially to have been reported at 818 F.2d 1386. On August 14, 1987, that opinion was withdrawn at the direction of the panel, and a new opinion issued. The August 14, 1987 opinion in *Modern American* is not, for purposes of this case, different in substance from the May 13, 1987, opinion. However, to avoid confusion, citations here to *Modern American* have been amended to conform with the language and pagination of the August 14, 1987 opinion.

There remains to be considered the tax treatment of the ceding commission deemed to have been paid to General Security. Taxpayer argues that if we adopt the imputed netting approach, the ceding commission should be subtracted from its 809(c)(1) premium income as "consideration arising out of reinsurance ceded," I.R.C. § 809(c)(1), rather than treated as an amortizable investment in an income-producing asset. *See Beneficial Life,* 79 T.C. at 645–48. Alternatively, taxpayer argues that it should be allowed to show the $212,438 difference (between the tangible assets received and the statutory reserve liabilities assumed) as a current operating loss, because the amount represents "start-up" costs incurred in the sale of reinsurance. Analogizing this reinsurance transaction to the initial sale of individual policies to members of the public, taxpayer argues that it should be allowed to treat the ceding commission as a direct underwriting agent's commission, and to deduct the full amount under I.R.C. § 809(d)(12). In effect, taxpayer seeks to achieve the same tax result that would have occurred if the additional income had not been recognized in the first place. *See Oxford,* 790 F.2d at 1375 n. 4.

■ Turning to taxpayer's Section 809(c)(1) argument, we recently have held in a closely related context that a ceding commission paid in a modified coinsurance transaction must be amortized over the estimated life of the indemnity agreement. *Modern American,* 830 F.2d at 112–13. However, in *Beneficial Life,* the Tax Court took a contrary view in a case involving conventional coinsurance. There, although the court recognized the applicability of the imputed netting approach to indemnity transactions, it went on to allow the plaintiff an immediate deduction for the full amount of the ceding commission. 79 T.C. at 646–48. Like *Beneficial Life,* this case also involves conventional coinsurance. Accordingly, we must decide the question left open in *Modern American, i.e.,* whether *Beneficial Life* was correctly decided on this issue. *Modern American,* 830 F.2d at 112. We conclude that it was not.

As we made clear in *Modern American,* the reference in Section 809(c)(1) to reductions in income for " 'premiums and other consideration arising out of reinsurance ceded' ... serv[es] to reduce the premium income of the initial insurer (the reinsured) only." *Id.* at 114. *But see Colonial American Life Ins. Co. v. Commissioner,* 51 T.C.M. 1123, 1127 (CCH) (1986) (clause applies to reduce premium income of reinsurer also). Moreover, the distinction we drew in *Modern American* between an amortizable ceding commission (as an investment in an income-producing asset) and the subtractions from premium income allowed by the last clause of Section 809(c)(1) (as amounts "which do not, in the end, 'belong' to the company in question, but must ... be ... turned over to or shared with another company under an indemnity reinsurance agreement"), 830 F.2d at 114, applies equally in this case. It makes no difference that in this transaction, unlike the one in *Modern American,* there is income from which taxpayer could in theory deduct the commission as a "return premium." The real issue, and the one decided in *Modern American* with respect to modified coinsurance, is whether Section 809(c)(1) should be read to permit taxpayer to treat as an immediate reduction of income during the taxable year the cost of acquiring in a conventional coinsurance arrangement an intangible asset "with an income-producing life extending substantially beyond the taxable year." *Id.* at 114. We hold that Section 809(c)(1) should not be so read.

■ Taxpayer's alternative argument that it is entitled to a Section 809(d)(12) deduction for the ceding commission is equally unpersuasive, because it relies upon the erroneous assumption that Congress intended to provide the same tax benefits to reinsurers that are provided to direct insurers. The Code provides for the deductibility of underwriting expenses such as agents' commissions, the costs of medical reports, and other costs associated with writing individual policies. I.R.C. § 809(d)(12) (implicitly incorporating I.R.C. § 162(a), which provides a deduction for "ordinary and necessary expenses" in conducting a business). It is apparent that

reinsurers, who acquire an entire block of policies in one transaction, were not the intended beneficiaries of Congress's favorable tax treatment of "small and new businesses" selling insurance directly to individual policyholders. *See* S.Rep. Reprint at 1583–84; *see also Oxford,* 790 F.2d at 1374; *Kentucky Central Life Ins. Co. v. Commissioner,* 57 T.C. 482, 499 (1972).

Notwithstanding the Tax Court's opinions in *Beneficial Life* and *Colonial American,* we do not believe that Congress intended to treat a ceding commission of the kind here at issue as a currently deductible underwriting expense analogous to an agent's commission paid by a direct insurer. Such an analogy is particularly inapt where, as here, taxpayer will play no role in the administration of the individual policies. *Cf. Oxford,* 790 F.2d at 1374 (analogy unsupportable even in assumption reinsurance transaction where reinsurer became directly liable to policyholders). Rather, the commission represents a one-time payment for the acquisition of an economic interest in a block of previously issued policies. Accordingly, we hold here, consistent with *Modern American,* that taxpayer must amortize the amount of the ceding commission deemed to have been paid to General Security.[9]

### III.

To summarize, we hold that taxpayer's distributions to its participating policyholders may not be characterized as return premiums under Section 809(c)(1), because the amounts so distributed are not "fixed in the [participating insurance] contract[s]", but are, within the meaning of the statute, dependent upon "the experience of the company or the discretion of the management." Accordingly, the distributions must be treated as dividends to policyholders. Second, we hold that in the reinsurance transaction entered into between taxpayer and General Security, taxpayer must be treated as having received consideration from General Security in an amount equal to the $1,062,159 in statutory

reserve liabilities assumed, and as having paid General Security a ceding commission equal to the $212,438 excess of those reserve liabilities over the $849,751 in tangible consideration received by taxpayer from General Security. Finally, we hold that taxpayer may not reduce its income by treating the ceding commission either as a reduction of income under Section 809(c)(1) for "consideration arising out of reinsurance ceded," or as an underwriting expense deductible under Section 809(d)(12). Rather, taxpayer must amortize the commission as the cost of acquiring an income-producing asset with a useful life extending substantially beyond the current taxable year.

The judgment of the District Court is REVERSED.

---

9. Taxpayer has not challenged the appropriateness of the five-year amortization period pre-

scribed by the Commissioner. *See* note 5, *supra.*