**OXFORD LIFE INSURANCE COMPANY, an Arizona corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. Civ 84–959 PHX RGS.**

United States District Court, D. Arizona.

Oct. 12, 1987.

Stephen M. McNamee, U.S. Atty., Phoenix, Ariz., Daniel F. Ross, Charles R. Lyons, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Theodore R. Groom, John P. McAllister, Groom and Nordberg, Chartered, Washington, D.C., Stephen E. Silver, Brad S. Ostroff, Burch & Cracchiolo, P.A., Phoenix, Ariz., for plaintiff.

**ORDER**

STRAND, District Judge.

### I. INTRODUCTION

This is an action by taxpayer Oxford Life Insurance Company seeking refunds of federal income taxes from the IRS for the years 1975 and 1976. Whether Oxford Life is entitled to these refunds turns on a determination of the income tax treatment of an indemnity reinsurance agreement between Oxford Life and Anchor National Life Insurance Co. ("Anchor").

### II. FACTUAL BACKGROUND

On December 27, 1976, Oxford Life entered into, what is in effect, an *indemnity* [1]

1. The tax law recognizes a distinction between   an *assumption* reinsurance agreement and an

*reinsurance*[2] agreement with Anchor National Life Insurance Company. The reinsurance agreement related to a block of single premium deferred annuities issued to one "Tenplan." Under the indemnity reinsurance or coinsurance agreement, Oxford Life became the "reinsurer" of Anchor Life's policy issued to "Tenplan."

The agreement provided that Oxford Life would reinsure only 80% of the annuity contracts involved.[3] In actually implementing this agreement, the following exchanges took place:

1. pursuant to the agreement, Oxford established $13,136,800.00 in statutory "reserves"[4] with respect to the annuity agreements;

2. as consideration for undertaking the indemnity reinsurance agreement, Anchor paid to Oxford $10,949,600.00 representing the reinsurance premiums associated with these annuity contracts; therefore, the statutory reserves that Oxford established were substantially more than the premiums actually received by Oxford from Anchor;

3. Oxford paid Anchor a commission on this sale in the amount of $639,408.00;

4. finally, Anchor also paid to Oxford $203,781 representing three (3) months interest on the net amount of premiums transferred.

The dispute involves how Oxford determined its "gain from operations" under 26 U.S.C. § 809(b)(1) (1954). Oxford Life determined its "gain from operations" as follows:

1. Oxford included the $10,949,600.00 (the reinsurance premiums received from Anchor) as premium income under 26 U.S.C. § 809(c)(1) and deducted the "statutory reserves" of $13,136,800.00;

2. Oxford further deducted the commission of $639,408 resulting in an immediate loss of $2,826,608.00.

The IRS redetermined Oxford's "gain from operations" as follows:

1. it included the amount of the statutory reserves ($13,136,800.00) as premium income received;

2. in addition, it took the difference between the "statutory reserves" ($13,136,800.00) and the net indemnity reinsurance premiums ($10,310,192.00) of $2,826,608.00 and treated it as an "acquisition cost" and amortized it over a five (5) year period.

## III. DISCUSSION

The broad question presented to the court is which party gave proper tax treatment to the transaction involved. Oxford contends that the I.R.S. improperly included the excess of the reserves over the net of the insurance premium received ($2,826,608.00) as an amortizable cost. Instead, it contends that this excess is a deductible cost of reinsurance which it is entitled to currently deduct. Oxford cites the U.S. Tax Court's decision in *Beneficial Life* as

*indemnity* reinsurance agreement. In an assumption reinsurance agreement, the reinsurer becomes directly liable to the original insureds/policyholders for the risks that it has assumed. *Prairie State Life Insurance Co. v. United States*, 828 F.2d 1222 at 1229, n. 4 (8th Cir.1987). In an indemnity reinsurance agreement, the reinsurer agrees only to indemnify the original insurer/ceding company who, at all times, remains directly liable on the insurance policy that is issued. *Id.*

**2.** "Reinsurance" is the process by which an insurance company (the insurer), which has issued an insurance or annuity policy to a policyholder (the insured), protects itself from liability on the policy. That is, the insurance company which gave the policy (the insurer) seeks, in turn, insurance on the insurance or annuity policy. The original insurer is then referred to as the "reinsured or ceding company" while the company that takes over the insurance obligations is referred to as the "reinsurer."

**3.** Pursuant to that agreement, Anchor could "recapture" 20% of the reinsured "tenplan" annuity contracts. That is, at the sole option of Anchor, they could take back 20% of these annuity contracts a year. The reinsurance agreement was to remain in effect until the annuity contracts ran out or until Anchor had "recaptured" all of the annuity contracts.

**4.** Oxford Life defines a "reserve" as that estimated portion of future benefit payments that are chargeable to that year. Oxford's Brief at 8.

persuasive authority for this position. The court in *Beneficial Life* does, in fact, hold that the difference between the assumed reserve liability and consideration paid to the ceding company is a currently deductible cost of issuing insurance. *Beneficial Life Insurance Co. v. Commissioner*, 79 T.C. 627, 651 (1982).

Having reviewed the parties' moving papers and arguments, however, the court finds more persuasive the reasoning in *Prairie States Life Insurance Co. v. United States*, 828 F.2d 1222 (8th Cir.1987) which also involved the tax treatment of an indemnity reinsurance agreement. There, the taxpayer did not include the full amount of the statutory reserves assumed as gross income. Rather, the taxpayer included in gross income the amount of consideration received from the ceding company, equal to 80% of the statutory reserves assumed in the transaction. The taxpayer then established the assumed reserves and, pursuant to 809(d)(2), deducted the full amount of the statutory reserves from its gross income. The net effect, as in the instant case, was to generate an immediate tax loss because the statutory reserves assumed exceeded the amount of consideration received.

The commissioner rejected the taxpayer's position arguing that the taxpayer should have treated the amount of statutory reserves assumed as gross income and taken a deduction equal to the excess of the reserves over the amount actually paid to the taxpayer. The Commissioner further stated that the deduction should be treated as an "acquisition cost" and amortized over a five (5) year period. This, of course, is precisely what the I.R.S. has argued in the instant case.

The Eighth Circuit held that the taxpayer must include the entire amount of the statutory reserves assumed in gross income, not simply the consideration received from the ceding company. *Id.* at 1232, 1234. The court further held that the taxpayer should be deemed to have paid to the ceding company a commission equal to the excess of the reserves over the consideration received by taxpayer. *Id.* at 1234.

Finally, the court held that the taxpayer must treat the commission as an amortizable income producing asset, not a currently deductible cost, entitled to currently deduct the commission paid to the ceding company. *Id.* at 1234. In reaching this decision, the court specifically considered and rejected the position taken by the Tax Court in *Beneficial Life*. *Id.* at 1233.

In view of the Eighth Circuit's decision, the court finds and concludes that the I.R.S. properly determined the plaintiff's tax liability.

Based on the foregoing,

IT IS ORDERED denying plaintiff's motion for partial summary judgment;

FURTHER ORDERED granting defendant's cross motion for partial summary judgment.