T.C. Memo. 2011-83

UNITED STATES TAX COURT

BRUCE A. AND CAROL ANFINSON BROWN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6825-08.                Filed April 12, 2011.


<u>Carol L. Anfinson</u>, for petitioners.

<u>Frederic J. Fernandez</u> and <u>Mark J. Miller</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  In 2005, Bruce Brown held a life insurance
contract with Northwestern Mutual Life Insurance Company.  On
December 18, 2005, Northwestern terminated the contract, using
its entire cash value of $37,365.06 to pay policy debt.
Petitioners (the Browns) did not report any gain or loss on their

2005 federal income tax return from the termination of the life insurance contract.

In a notice dated December 24, 2007, respondent (the IRS) determined a deficiency in tax of $8,553 for tax year 2005. The deficiency was the result of the IRS's determination that Mr. Brown recognized a taxable gain of $29,093.30 on termination of the Northwestern contract. The IRS also determined that the Browns were liable for a penalty of $1,711 under section 6662.[1] The Browns dispute those determinations.

                          FINDINGS OF FACT

The parties stipulated some facts; those facts are so found.

The Browns

Bruce Brown is a commercial litigation attorney who has been licensed since 1973. His wife, Carol Anfinson Brown, is also an attorney. She has a master of laws degree (LL.M.) in taxation and does appellate work in state court.

The Insurance Contract

On March 16, 1982, Mr. Brown purchased a life insurance policy from Northwestern with a $1,837 annual premium and a $100,000 death benefit. The policy listed Mr. Brown as the insured and as the policy's owner, and it listed Mrs. Brown as its direct beneficiary.

---

[1]All section references are to the Internal Revenue Code, as amended, effective during the year at issue, unless otherwise indicated.

The policy was eligible for dividends, meaning that if Northwestern had a divisible surplus, the policyholder (here, Mr. Brown) was entitled to receive a fraction of the divisible surplus in the form of a dividend. The policy listed four options for how Mr. Brown could direct Northwestern to pay the dividends; he could direct Northwestern to (i) pay dividends directly to him, (ii) allow dividends to accumulate, (iii) apply dividends to premiums, or (iv) apply dividends to purchase paid-up additional insurance. Besides the four listed options, the policy also stated that "[o]ther uses of dividends may be made available by * * * [Northwestern]." The policy provided that if Mr. Brown did not direct otherwise, Northwestern would apply the dividends to purchase paid-up additional insurance.

Paid-up additional insurance is single premium insurance; for a one-time payment, it increases the policy's death benefit and share of divisible surplus without increasing the annual premium. The policy allowed Mr. Brown to surrender the paid-up additional insurance in exchange for its cash value.

Over time, the policy accumulated "cash value". Cash value was important because, as explained below, (i) the policy allowed Mr. Brown to borrow from Northwestern against its cash value and (ii) if the policy terminated before Mr. Brown died, Northwestern would pay Mr. Brown the policy's cash value minus any outstanding loans.

Assuming Mr. Brown paid all premiums, the policy's "cash value" at the end of any policy year would be the sum of (i) any dividend accumulations, (ii) the value from the table of guaranteed values, and (iii) the cash value of any paid-up additional insurance. The table of guaranteed values was in the contract; it gave the cash value for the end of each policy year,[2] a value which increased over time. The contract stated that during the year values would "reflect any portion of the year's premium paid and the time elapsed in that year."

The policy allowed Mr. Brown to borrow from Northwestern against the policy's cash value. The policy labeled these loans "premium loan[s]" if they were applied to policy premiums or "policy loan[s]" if they were used for anything else. Both types of loans accrued interest at an annual effective rate of 8 percent. If unpaid, the interest was capitalized, meaning Northwestern added accrued interest to principal. If Mr. Brown died while the loans were outstanding, Northwestern would reduce the death benefit by the balance of the loans.

Mr. Brown could surrender the policy in exchange for its cash value. If he did so, the contract would terminate and Northwestern would use the policy's cash value to pay policy

---

[2]The table gave a value for each of the first 20 years and then values for the years in which Mr. Brown would turn 60, 65, and 70 (that is for the policy years ending in 2007, 2012, and 2017). The contract stated that the values in the table assumed the policyholder paid all premiums when due.

debt, which was the total of all outstanding loans and accumulated interest.  Then, if the policy's cash value exceeded policy debt, Northwestern would pay Mr. Brown the excess.

If, at any time, policy debt exceeded cash value, Northwestern could apply the policy's cash value to the policy debt and terminate the contract.

Premium Payments

Each year Mr. Brown paid premiums by check, loans, or dividends.

- From 1982 through 1986, he paid $1,837 each year by check.

- From 1987 through 2000, he paid $1,837 each year by taking loans against the policy's cash value.

- From 2001 through 2003, he paid each year's premiums in semiannual installments of $938.[3]  Each year he paid the first installment by taking loans and the second installment by check.

- In 2004 and 2005, he paid the annual premium of $1,837 by directing Northwestern to apply dividends to premiums.

---

[3]The product of $938 and 2 is $1,876, which is $39 greater than $1,837.  The record does not make clear why the premium for these 3 years is higher than $1,837.

In total Mr. Brown paid $44,205 in premiums:  $11,999 by check, $28,532 by loans, and $3,674 by dividends.  The following table shows how he paid the premium each year:

| Year | Paid by Check | Paid by Loan | Paid by Dividend |
|------|---------------|--------------|------------------|
| 1982 | $1,837 | -0- | -0- |
| 1983 | 1,837 | -0- | -0- |
| 1984 | 1,837 | -0- | -0- |
| 1985 | 1,837 | -0- | -0- |
| 1986 | 1,837 | -0- | -0- |
| 1987 | -0- | $1,837 | -0- |
| 1988 | -0- | 1,837 | -0- |
| 1989 | -0- | 1,837 | -0- |
| 1990 | -0- | 1,837 | -0- |
| 1991 | -0- | 1,837 | -0- |
| 1992 | -0- | 1,837 | -0- |
| 1993 | -0- | 1,837 | -0- |
| 1994 | -0- | 1,837 | -0- |
| 1995 | -0- | 1,837 | -0- |
| 1996 | -0- | 1,837 | -0- |
| 1997 | -0- | 1,837 | -0- |
| 1998 | -0- | 1,837 | -0- |
| 1999 | -0- | 1,837 | -0- |
| 2000 | -0- | 1,837 | -0- |
| 2001 | 938 | 938 | -0- |
| 2002 | 938 | 938 | -0- |
| 2003 | 938 | 938 | -0- |
| 2004 | -0- | -0- | $1,837 |
| 2005 | -0- | -0- | 1,837 |
| Subtotal | 11,999 | 28,532 | 3,674 |
| Total premiums | | | 44,205 |

Dividend Use

Initially Mr. Brown did not direct the dividends' use, so Northwestern applied them to purchase paid-up additional insurance. In March 2004 Mr. Brown executed a change-of-dividend form, electing to have Northwestern apply dividends first to premiums and then to policy debt. In 2004 the total dividend was $2,986.94; in accordance with the new election, Northwestern applied $1,837 to the policy premium and $1,149.94 to interest on the loans. In 2005 the total dividend was $1,883; Northwestern applied $1,837 to the policy premium and $46 to interest on the loans. On their income tax returns, the Browns properly excluded all of the dividends from gross income.

Policy Debt and Termination

Mr. Brown increased the policy debt by taking loans and by allowing unpaid interest to capitalize. By borrowing to pay the premiums, he added $1,837 to the policy debt in May of each year from 1987 through 2000 and $938 to the policy debt in May of 2001, 2002, and 2003. Before 2004 interest was capitalized each year because he made no interest payments. By 1997 the annual interest accrual exceeded the premium; by 2002, it was twice the premium. As previously discussed, the policy provided that Northwestern could terminate it if the policy debt exceeded cash value. Policy debt first exceeded cash value in November 2004. Mr. Brown reduced the policy debt on December 29, 2004, by

surrendering the paid-up additional insurance for its cash value of $31,063.30.  Of that $31,063.30, Northwestern applied $27,252.49 to principal and $3,810.81 to interest.  Surrendering the paid-up additional insurance, however, reduced the policy's cash value and the policy debt by the same amount because the policy's cash value included the cash value of the paid-up additional insurance.[4]  Thus policy debt continued to exceed the policy's cash value, and Northwestern terminated the policy on January 6, 2005.

On February 16, 2005, Northwestern restored the policy because Mr. Brown made a $559 "minimum interest payment" of which $428.04 went to interest and $130.96 went to principal.  On March 21, 2005, Mr. Brown made a final cash payment of $162.82, all of which went to interest.

Mr. Brown made no more payments, and Northwestern again terminated the policy on December 18, 2005.  At that time, the policy's cash value was $37,365.06.  Northwestern applied the cash value to the policy debt, which, as of December 18, 2005, was $37,395.48.[5]  Because the policy debt of $37,395.48 exceeded

---

[4]Applying the cash value of the paid-up additional insurance to policy debt did have one positive effect for the Browns:  it decreased the annual interest accrual by reducing the principal.

[5]The policy debt included $35,273.76 of principal as of Dec. 18, 2005 and $2,121.72 of interest, which had accrued between Mar. 21, 2005 (the date of Mr. Brown's final payment) and Dec. 18, 2005.  There is an unexplained discrepancy because the total

(continued...)

the policy's cash value of $37,365.06, Northwestern did not make a cash payment to the Browns.

Northwestern's Computation of Taxable Gain

Northwestern sent Mr. Brown a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc. The Form 1099-R showed a gross distribution of $37,365.06 and a taxable amount of $29,093.30. The Form 1099-R described the $37,365.06 as "loans repaid at surrender" and described the $29,093.30 as "taxable amt. at surrender".

According to Northwestern's calculations, the $29,093.30 taxable amount was equal to the policy's cash value of $37,365.06 minus what it called "net cost" of $8,271.76. Net cost was calculated as "total premiums" (the premiums paid by loans, $28,532; by checks, $11,999; and by dividends, $3,674) minus what Northwestern called "total dividends" (in which Northwestern included the $2,986.94 dividend payment to Mr. Brown in 2004, the $31,063.30 received by Mr. Brown on surrender of the paid-up additional insurance in 2004, and the $1,883 dividend payment to Mr. Brown in 2005).

---

[5](...continued)
policy debt of $37,395.48 exceeds the cash value of $37,365.06 by $30.42. The record does not reveal whether Mr. Brown paid the additional policy debt, whether Northwestern forgave the additional policy debt, or whether Mr. Brown still owes Northwestern the additional policy debt.

The Browns' Reporting for Tax Year 2005

Mr. Brown prepared the Browns' return, which did not report any income from terminating the life insurance contract. Before filing the return, he consulted Mrs. Brown about the Form 1099-R. They believed that Northwestern based its report that Mr. Brown had a $29,093.30 taxable gain on the theory that a debtor has a taxable gain when a creditor cancels a debt. They believed Northwestern was incorrect because Northwestern had not forgiven Mr. Brown's debt. Having concluded that Northwestern analyzed the termination of the policy incorrectly, the Browns made no further attempt to determine the proper tax treatment of the transaction.

OPINION

I.  The IRS Correctly Determined That Mr. Brown Had a $29,093.30 Taxable Gain on Termination of the Life Insurance Contract.

As we describe in greater detail later, the IRS argues that the tax consequences of the $37,365.06 are controlled by section 72(e)(5)(A) and (C), which provides that an amount received under a life insurance contract that is not received as an annuity is included in gross income to the extent it exceeds investment in the contract. The Browns argue, first, that they did not receive the $37,365.06 and, second, that if they did, it is not included in gross income under section 72(e)(4)(B). We disagree.

For federal income tax purposes, loans against a life insurance contract's cash value are true loans from the insurance

company to the policyholder.  See <u>Minnis v. Commissioner</u>, 71 T.C. 1049, 1054 (1979); <u>Sanders v. Commissioner</u>, T.C. Memo. 2010-279; <u>McGowen v. Commissioner</u>, T.C. Memo. 2009-285; <u>Barr v. Commissioner</u>, T.C. Memo. 2009-250; <u>Atwood v. Commissioner</u>, T.C. Memo. 1999-61.  Thus, using the policy's proceeds to satisfy the loans has the same effect as paying the proceeds directly to the policyholder.  See, e.g., <u>Atwood v. Commissioner</u>, <u>supra</u>.  For example, in <u>Barr</u> and <u>Atwood</u> the insurance companies credited the cash value of the terminated life insurance policies against existing policy debt.  The policyholders had incurred the policy debt for reasons other than the payment of premiums.  The Court held that the policyholders constructively received the amounts used to satisfy the loans because the policy proceeds paid genuine debts.  See, e.g., <u>Barr v. Commissioner</u>, <u>supra</u>; <u>Atwood v. Commissioner</u>, <u>supra</u>.  On December 18, 2005, Northwestern terminated the life insurance contract with Mr. Brown.  At that time the policy's cash value was $37,365.06.  On termination, the policy's only proceeds were its cash value.  Northwestern applied the entire cash value to pay policy debt, and Mr. Brown thus constructively received $37,365.06--the amount of the policy proceeds Northwestern used to satisfy policy debt.  The Browns argue that Mr. Brown did not constructively receive the amount applied to satisfy the policy debt because Mr. Brown incurred that debt to pay premiums.  They point out that the taxpayers in

Barr v. Commissioner, supra, and Atwood v. Commissioner, supra, did not incur policy debt to pay premiums.  But it does not matter why Mr. Brown incurred the debt.  All that matters it that the policy debt was genuine.  See Atwood v. Commissioner, supra. Mr. Brown's policy debt was genuine:  Northwestern lent him the policy premiums, allowing him to continue to enjoy the benefits of the policy without paying premiums out of pocket.  Because the policy debt was genuine, Mr. Brown constructively received the proceeds that Northwestern used to satisfy that debt.  Thus the $37,365.06 cash value Northwestern used to satisfy Mr. Brown's policy debt is an amount received under a life insurance contract.

We now turn to the tax treatment of that $37,365.06.  Any amounts received under a life insurance contract that were paid because of the death of the insured are excludable from the gross income of the recipient; that is, they are not taxable.  Sec. 101(a)(1).[6]  The tax treatment of amounts received under a life

---

[6]As the House conference report on the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, correctly summarizes:

> the undistributed investment income ("inside buildup") earned on premiums credited under a contract that satisfies a statutory definition of life insurance is not subject to current taxation to the owner of the contract.  In addition, death benefits paid under a contract that satisfies the statutory definition are excluded from the gross income of the recipient, so that neither the owner of the contract nor the

(continued...)

insurance contract, but before the death of the insured, is found in section 72.

Section 72 determines the taxation of amounts received under annuity contracts, endowment contracts, and life insurance contracts.  Section 72 gives several rules for the tax treatment of various types of amounts.  How these rules apply to a particular amount depends on (i) the type of payment (i.e. whether the payment is received as an annuity, a part of a series of payments over time); (ii) the type of contract (i.e. whether the contract was an annuity contract, endowment contract, or life insurance contract); and (iii) the time of payment (i.e. whether the payment was made before or after a date referred to as the annuity starting date[7]).

If the type of payment is an annuity, the payment's tax treatment is governed by the rule of section 72(a).  Payments that are not received as an annuity are governed by section 72(e).  Under section 72(e), the tax treatment of such nonannuity

---

[6](...continued)
beneficiary of the contract is ever taxed on the inside buildup * * * .

H. Conf. Rept. 100-1104 (Vol. II), at 96 (1988), 1988-3 C.B. 473, 586.

[7]Generally, the annuity starting date is the latter of "the date upon which the obligations under the contract became fixed" or "the first day of the period (year, half-year, quarter, month, or otherwise, depending on whether payments are to be made annually, semiannually, quarterly, monthly, or otherwise) which ends on the date of the first annuity payment."  Sec. 1.72-4(b)(1), Income Tax Regs.

amounts is governed by the general rule of section 72(e)(2),[8] and, if applicable, the special rule of section 72(e)(5).  The special rule of section 72(e)(5) governs amounts received under a life insurance contract.  Sec. 72(e)(5)(C).

Here, the amount was received before Mr. Brown's death, so section 72 governs its tax treatment.  The amount was not received as an annuity, so section 72(e)--not section 72(a)-- governs its tax treatment.  And the amount was received under a life insurance contract, so the special rule of section 72(e)(5) governs the tax treatment of the $37,365.06 Mr. Brown received.

We turn next to how section 72(e)(5) affects the tax treatment of the $37,365.06.  Section 72(e)(5)(A) provides that

> (A)  In general.  In any case to which this paragraph applies--
>
> > (i) paragraphs (2)(B) and (4)(A) shall not apply, and
>
> > (ii) if paragraph (2)(A) does not apply,
>
> the amount shall be included in gross income, but only to the extent it exceeds the investment in the contract.

Two points of explanation are required.  First, "[paragraph] (2)(B)" is section 72(e)(2)(B), the general rule for amounts received before the annuity starting date that are not received as an annuity.  Thus for amounts governed by the special rule of

---

[8]Under that general rule, sec. 72(e)(2)(A) governs amounts received on or after the annuity start date and sec. 72(e)(2)(B) governs amounts received before.

section 72(e)(5) that are received before the annuity starting date, the general rule is expressly not applicable.  Sec. 72(e)(5)(A)(i).  Second, "paragraph (2)(A)" is section 72(e)(2)(A), the general rule for amounts received after the annuity starting date that are not received as an annuity.  Thus an amount governed by the special rule of section 72(e)(5) to which section 72(e)(2)(A) "does not apply" is included in gross income to the extent it exceeds investment in the contract.  Sec. 72(e)(5)(A).  Mr. Brown received the $37,365.06 before the annuity starting date, so section 72(e)(2)(A) "does not apply".  Thus under the special rule of section 72(e)(5), the $37,365.06 is included in gross income to the extent it exceeds Mr. Brown's investment in the contract.  Sec. 72(e)(5)(A).

Section 72(e)(6) defines "investment in the contract". Section 72(e)(6) provides:

> For purposes of this subsection, the investment in the contract as of any date is--
>
>> (A) the aggregate amount of premiums or other consideration paid for the contract before such date, minus
>>
>> (B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws.

Thus investment in the contract is (i) the total premiums or other consideration paid minus (ii) the total amount (a) received under the contract and (b) excludable from gross income.

Mr. Brown's investment in the contract was $8,271.76. He paid total premiums of $44,205: $11,999 paid by check, $28,532 paid by loans, and $3,674 paid by applying dividends to premiums. Before terminating the contract, he received $35,933.24 that was excludable from gross income: the $2,986.94 dividend payment in 2004; the $31,063.30 proceeds from the 2004 surrender of the paid-up additional insurance; and the $1,883 dividend payment in 2005. Hence his investment in the contract was $8,271.76: the $44,205 total premiums paid minus the $35,933.24 he had received under the contract that was excludable from gross income.[9]

_____

[9]Our calculation of Mr. Brown's investment in the contract does not include the dividends (up to 2003) that purchased paid-up additional insurance (distinguished from the cash value of that paid-up additional insurance on surrender) for two reasons. First, with the exception of dividends received in 1987, 1988, and 1995, the record does not give the amounts of those dividends. Second, as we explain below, regardless of the amounts, those dividends did not affect Mr. Brown's investment in the contract.

Investment in the contract is (i) the total premiums or other consideration paid minus (ii) the total amount (a) received under the contract and (b) excludable from gross income. Sec. 72(e)(6). The dividends used to purchase the paid-up additional insurance--which were excludable from gross income--did not affect Mr. Brown's investment in the contract because the dividends increased both the total premiums or other consideration paid and the total amount received under the contract and excludable from gross income by the same amount, the amount of the dividends.

For example, suppose a policyholder paid $10 in total premiums for a life insurance contract. Suppose further that the first amount the policyholder received under the contract was a $1 dividend that the policyholder received before the annuity start date and used to purchase paid-up additional insurance. Before the policyholder received the dividend, the policyholder's

(continued...)

Thus under the special rule of section 72(e)(5), Mr. Brown had gross income of $29,093.30, which is the amount by which the $37,365.06 he received exceeded his $8,271.76 investment in the contract. The IRS was therefore correct in determining that the Browns were required to include $29,093.30 in gross income from the termination of the Northwestern life insurance contract.

The Browns contend that even if Mr. Brown received the $37,365.06, the tax treatment of that amount is governed by section 72(e)(2)(B) and that the $37,365.06 is not included in gross income under section 72(e)(4)(B). We have already explained why the special rule of section 72(e)(5)--not the general rule of section 72(e)(2)--controls the tax treatment of the $37,365.06. So the Browns are wrong.

But even if they were right that section 72(e)(2)(B) controlled, they would still be wrong: section 72(e)(4)(B) would not exclude any part of the $37,365.06 from gross income.

---

[9](...continued)
investment in the contract would be $10, the $10 total consideration paid minus the $0 received under the contract and excludable from gross income. When the policyholder received the dividend, it would be excludable from gross income because it would be less than the policyholder's investment in the contract at the time (the $10 total consideration paid minus the $0 received under the contract and excludable from gross income). See sec. 72(e)(5)(A). After the policyholder received the dividend, the policyholder's investment in the contract would still be $10, the $11 total consideration paid minus the $1 received under the contract and excludable from gross income. Thus dividends used to purchase paid-up additional insurance do not affect the policyholder's investment in the contract.

Section 72(e)(4)(B) provides that for purposes of section 72(e)(2)(B):

> Any amount described in * * * [section 72(e)(1)(B)]
> shall not be included in gross income under * * *
> [section 72(e)(2)(B)(i)] to the extent such amount is
> retained by the insurer as a premium or other
> consideration paid for the contract.

An amount described in section 72(e)(1)(B) is "any amount received which is in the nature of a dividend or similar distribution".  Thus section 72(e)(4)(B) excludes from income only amounts received that are in the nature of a dividend or similar distribution.  The $37,365.06 that Mr. Brown received was not a dividend, was not in the nature of a dividend, and was not a similar distribution.  It was the cash value of the policy, and it was unrelated to Northwestern's divisible surplus.  Moreover, Northwestern did not retain the $37,365.06 to pay premiums but to pay policy debt.  So even if section 72(e)(2)(B) controlled-- which it does not--section 72(e)(4)(B) would not prevent any part of the $37,365.06 from being included in gross income.

As we have discussed, we agree with the IRS that the Browns were required to include $29,093.30 in gross income from the termination of the Northwestern life insurance contract.  The IRS contends that the tax required to be shown on the return was $52,995 and that the deficiency in income tax was $8,553.  This $8,553 amount reflected on the notice of deficiency is equal to the difference between the $52,995 required to be shown on the

return and the $44,442 supposedly shown as tax on the return.
Yet the record shows that the amount of tax shown on the return
was not $44,442, but $43,763.67. The amount of the deficiency
reflected in the deficiency notice was therefore probably in
error; it probably understated the deficiency by several hundred
dollars. Even though the IRS may have presented evidence showing
that the correct amount of tax should be $52,995, and therefore
that the deficiency should be several hundred dollars more than
what is reflected on the deficiency notice, we question whether
we have jurisdiction to redetermine a deficiency of more than
$8,553. As explained below, we conclude that we lack such
jurisdiction. Section 6214(a) provides:

> Except as provided by section 7463, the Tax Court shall
> have jurisdiction to redetermine the correct amount of
> the deficiency even if the amount so redetermined is
> greater than the amount of the deficiency, notice of
> which has been mailed to the taxpayer, and to determine
> whether any additional amount, or any addition to the
> tax should be assessed, if claim therefor is asserted
> by the Secretary at or before the hearing or a
> rehearing.

Thus if the IRS asserts a greater deficiency than is reflected on
the notice and the IRS does so before the hearing or a rehearing,
we have jurisdiction to redetermine a deficiency or addition to
tax greater than the amount shown on the notice. See, e.g.,
Brooks v. Commissioner, T.C. Memo. 1975-295 (holding that the Tax
Court had jurisdiction to redetermine an increased deficiency
where the IRS asserted the higher deficiency in its answer),

affd. without published opinion 552 F.2d 367 (5th Cir. 1977).

Here, the IRS failed to assert that the deficiency is greater

than $8,553, and we therefore lack jurisdiction to redetermine a

greater deficiency.  See sec. 6214(a); see also Browning v.

Commissioner, T.C. Memo. 1991-93 n.3 ("Although the evidence

indicates a higher deficiency than determined on the notice of

deficiency, because respondent did not assert this higher amount

before trial, we are without jurisdiction to redetermine a

greater amount.").  We therefore uphold the IRS's determination

that the Browns had a deficiency in tax of $8,553 for tax year

2005.  The remaining issue is whether the Browns are liable for a

penalty.

II.  Penalty

The IRS determined that the Browns were liable for the

accuracy-related penalty under section 6662.  Section 6662 adds

to the tax 20 percent of any underpayment attributable to a

substantial understatement of income tax.

Section 6662(d) defines "substantial understatement".

Generally, an "understatement" is the excess of tax required to

be shown on the return over the tax shown on the return.  Sec.

6662(d)(2)(A); sec. 1.6662-4(b)(2), Income Tax Regs.  An

understatement is substantial if it exceeds $5,000 and it exceeds

10 percent of the tax required to be shown on the return.  Sec.

6662(d)(1)(A); sec. 1.6662-4(b)(1), Income Tax Regs.

A.    The IRS Met Its Burden of Producing Evidence That the
      Browns Are Liable for the Accuracy-Related Penalty.

The IRS bears the burden of producing evidence that the

taxpayer is liable for penalties.  Sec. 7491(c).  This burden is

satisfied if the IRS comes forward with "sufficient evidence

indicating that it is appropriate to impose the relevant

penalty."  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  We

have upheld the IRS's determination that the Browns understated

their income tax by $8,553, which exceeds both $5,000 and 10

percent of the tax required to be shown on the return.[10]  The IRS

has therefore met its burden of producing evidence showing that

the Browns are liable for the accuracy-related penalty.

B.    The Browns Have Not Proven That They Are Not Liable for
      the Penalty.

Once the IRS satisfies its burden of production, the

taxpayers must prove they are not liable for penalties.  Id. at

446-447.  The taxpayer bears the burdens of both production and

proof regarding exceptions to the substantial understatement

penalty.  See id. at 446 (stating that the IRS "need not

introduce evidence regarding reasonable cause, substantial

authority, or similar provisions").  The Browns have not

---

[10]As discussed above, the notice of deficiency states that
the Browns' return showed tax of $44,442, but the tax shown on
the return is $43,763.67.  To the extent the discrepancy might
increase the penalty, the IRS did not assert the issue.  We
therefore lack jurisdiction to impose any additional amount.  See
sec. 6214(a).

satisfied their burden to show that they are not liable for the penalty. And, as we explain below, they have not shown that any of the exceptions to the substantial understatement penalty applies to them.

### i. Substantial Authority

If there is substantial authority for the taxpayer's treatment of an item on the return, the tax attributable to the item is not included in the understatement. Sec. 6662(d)(2)(B); sec. 1.6662-4(d)(1), Income Tax Regs. There is substantial authority for the taxpayer's treatment of an item if substantial authority exists either (i) when the taxpayer files the return or (ii) on the last day of the taxable year to which the return relates. Sec. 1.6662-4(d)(3)(iv)(C), Income Tax Regs.

The Browns cite several sources as substantial authority: (i) section 72(e); (ii) Barr v. Commissioner, T.C. Memo. 2009-250; (iii) Atwood v. Commissioner, T.C. Memo. 1999-61; (iv) a Field Service Advice Memorandum, and (v) an excerpt from Brody et al., Insurance-Related Compensation, 386-3d Tax Mgmt. (BNA). As we explain below, these sources do not provide substantial authority for the Browns' position.

A position may have substantial authority if its support is "a well-reasoned construction of the applicable statutory provision." Sec. 1.6662-4(d)(3)(ii), Income Tax Regs. But the

Browns failed to give a well-reasoned construction of section 72(e).

Judicial opinions can be substantial authority for a taxpayer's position. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. But neither opinion cited by the Browns (Barr v. Commissioner, supra, and Atwood v. Commissioner, supra) supports their position. In both cases we held that policy proceeds constructively received through the payment of policy debt should be included in gross income. See Barr v. Commissioner, supra; Atwood v. Commissioner, supra. And even if those cases supported the Browns, only Atwood could be "authority" for their position because Barr--issued in 2009--did not exist when the Browns filed their return. See sec. 1.6662-4(d)(3)(iv)(C), Income Tax Regs.

Finally, neither the Field Service Advice Memorandum nor the treatise excerpt provides substantial authority. Section 1.6662-4(d)(3)(iii) and (iv)(A), Income Tax Regs., lists the types of sources that are "authority" for the purpose of the substantial authority exception. Neither a Field Service Advice Memorandum nor a conclusion reached in a treatise is a source that serves as "authority". Yet the authorities underlying those sources may still give rise to substantial authority if they are "applicable to the facts of a particular case". Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. But the treatise and the Field Service Advice Memorandum do not cite authorities other

than section 72, and we have already explained why section 72 does not support the Browns.  Thus the authority underlying both sources does not give rise to substantial authority.

The Browns have not shown that there was substantial authority for their position.

### ii.  Reasonable Cause and Good Faith

If the taxpayer both (i) had reasonable cause for and (ii) acted in good faith regarding part of the underpayment, no penalty is imposed on that part.  See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.  The Browns argue that they did not report the item because they believed that Northwestern based the Form 1099-R on the theory that a debtor has a taxable gain when a creditor cancels a debt, a theory that would not apply here because Northwestern did not discharge the loan.  But even if the Browns' mistake about why Northwestern reported income was reasonable, the mistake was not reasonable cause for their underpayment.  One of the most important factors in demonstrating reasonable cause and good faith is the extent of the taxpayer's effort to determine the proper tax liability.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The Browns exerted little effort.  They understood correctly that there was no discharge of debt.  They therefore concluded that Northwestern's information return, which they misconstrued as having been based on a discharge-of-debt theory, was wrong.  Yet they did not research

the proper tax treatment of the transaction.  They did not even make the simple effort of asking Northwestern why it reported income where there was no discharge of debt.  And, finally, the Browns' experience, knowledge, and education weigh against them: both are licensed attorneys, and one has a master of laws degree (LL.M.) in taxation.  In short, the Browns have failed to show that they had reasonable cause for and acted in good faith regarding the underpayment.

We therefore find that the IRS correctly determined that the Browns are liable for the substantial understatement penalty under section 6662(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.