# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2508

BRUCE A. BROWN and CAROL ANFINSON BROWN,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeal from the United States Tax Court

No. 6825-08—**Richard T. Morrison**, *Judge*.

ARGUED MAY 25, 2012—DECIDED SEPTEMBER 11, 2012

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The Tax Court ruled that the petitioners, a married couple filing a joint return, had underpaid federal income tax for 2005 by $8,553. The court assessed a deficiency equal to that amount and tacked on a penalty of $1,711 (20 percent of the deficiency, the IRS apparently having rounded off $1710.60 to $1711).

The basis of the deficiency was the taxpayers' failure to include in their taxable income for that year income

realized by Mr. Brown upon the cancellation of a $100,000 life insurance policy that he owned, a whole life policy issued to him by Northwestern Mutual Life Insurance Company in 1982. In such a policy the insured pays a constant annual premium and the policy pays the same death benefit whenever he dies. Since he is more likely to die when he gets older yet the policy premiums don't increase as he ages, the insurance company must charge a premium that produces an overcharge in the early years in order to build up a store of value that will defray the cost of paying the death benefit in later years, which is when death is more likely, and the death benefit therefore more likely to become payable, than in the earlier years. The sum of the overcharges is called the policy's "cash value," and the policyholder can borrow against it either for personal reasons or to pay future premiums. Alternatively, by canceling the policy, which he can do at any time, he is entitled to receive the cash value (called in that event the "cash surrender" value) less any outstanding loans against it. See 1 Robert H. Jerry, II, *New Appleman on Insurance Law Library Edition*, § 1.08(b)(ii) (2012). He is also entitled to the cash sur-render value if the insurance company, rather than he, cancels the policy, as the company is entitled to do if his borrowing from the company exceeds the cash value—in which event, however, he will owe the company more than it owes him.

An insurance company doesn't just sit on a policy-holder's premium payments, of course; it invests them; and as is the practice of mutual insurance companies,

Northwestern Mutual credits part of the income from investing them to the policyholder's account with the company and calls these credits "dividends." Northwestern Mutual, "Company Overview: What Mutuality Means to You," www.northwesternmutual.com/about-northwestern-mutual/our-company/company-overview.aspx#Mutuality (visited Aug. 21, 2012); see *Indianapolis Life Ins. Co. v. United States*, 115 F.3d 430, 431 (7th Cir. 1997); *Prairie States Life Ins. Co. v. United States*, 828 F.2d 1222, 1223-24 (8th Cir. 1987). Brown's policy gave him a choice among receiving his dividends in cash, using them to pay future premiums, or—the default option specified in the policy—buying additional life insurance above the face amount of the policy ($100,000 in Brown's policy). Because he made no selection among these alternatives, by default the dividends were used to increase his life insurance.

The policy required an annual premium of $1,837. From 1982 to 1986 Brown paid in cash, but from 1987 to 2000 he paid by borrowing against the policy's cash value, with the result that his indebtedness to the insurance company increased. From 2001 through 2003, with his indebtedness approaching the policy's cash value, he paid half the premiums in cash and the rest by borrowing from the company. Nevertheless in 2004 his indebtedness exceeded the policy's cash value, and he surrendered the additional insurance that he had obtained by applying his dividends to the purchase of additional insurance and he directed that future dividends be used to pay premiums and pay back his accumulated

debt to the company. But by the end of 2005 the amount he had borrowed from the insurance company again exceeded the policy's cash value (though only by $30.42), and this time the insurance company cancelled the policy, as the terms of the policy entitled it to do.

The $31,063.30 of additional insurance that Brown surrendered in 2004 and the $4,869.94 of dividends subsequently applied at his direction to pay premiums and repay debt in that and the following year are at the heart of the litigation. The position of the Internal Revenue Service, seconded by the Tax Court, is that these moneys (totaling $35,933.24) are value that Brown received from the policy before it was cancelled. Therefore they reduce by this amount his net "investment in the [insurance] contract" (the sum of all premiums that the policyholder paid minus any amounts he received before he surrendered the policy upon its cancellation by the insurance company or by his own choice, 26 U.S.C. § 72(e)(6)). That is a reduction in net investment from $44,205.00 to $8,271.76 ($44,205.00 – $35,933.24). According to the terms of the policy, the policy had a cash value of $37,356.06 at the time of surrender.

An investment of $8,271.76 that makes the policy worth $37,365.06 on surrender generates $29,093.30 ($37,365.06 – $8,271.76) in taxable income. But Brown contends that really he invested the full $44,205 in the contract (the policy) within the meaning of the applicable tax law—that that amount should not be diminished by the $35,933.24 in additional insurance and dividends received—and that therefore he realized a net loss when the policy was

cancelled, and so no tax is due. Naturally he is loath to pay any tax in respect of the cancellation, since he received no money from it.

The cash value of a surrendered (whether or not voluntarily surrendered) life insurance policy is includable in gross income "to the extent it exceeds the [taxpayer's] investment in the [insurance] contract," 26 U.S.C. § 72(e)(5)(A), and is taxable as ordinary income. *Barr v. Commissioner*, No. 8705-08, 2009 WL 3617587, at *3 (U.S. Tax Ct. Nov. 3, 2009); see also *Wolff v. Commissioner*, 148 F.3d 186, 189-90 (2d Cir. 1998). When Brown's policy was cancelled, its cash value was $37,365.06. What had he invested in the policy? That is, what was his cost (his "basis," in tax-speak)? Remember that he had paid a total of $44,205.00 in premiums but had received $35,933.24 from surrendering the additional insurance in 2004 and from using dividends to pay premiums and loans in 2004 and 2005. The difference of $8,271.76 was the net cost to him of the cash surrender value of the policy, and subtracting the $8,271.76 cost from that value resulted in taxable gross income of $29,093.30, just as the Tax Court ruled, even though Brown had received no cash because the cash value of the policy had been used to pay off the loans that he had gotten from the company to pay for his premiums. E.g. *Feder v. Commissioner*, No. 1628-10, 2012 WL 75114, at *4 (U.S. Tax Ct. Jan. 10, 2012); *Sanders v. Commissioner*, No. 3395-09, 2010 WL 5327897, at *2 (U.S. Tax Ct. Dec. 20, 2010); *McGowen v. Commissioner*, No. 14116-07, 2009 WL 4797538, at *4 (U.S. Tax Ct. Dec. 14, 2009), affirmed on other grounds, 438 Fed. Appx. 686 (10th Cir. 2010).

Brown claims that the $35,933.24 in additional insurance and dividend payments was (or was equivalent to) "dividends . . . retained by the insurer as a premium or consideration paid for the [insurance] contract," which 26 U.S.C. § 72(e)(4)(B) excludes from gross income. But that section is inapplicable to payments under life insurance policies. It is captioned "special rules for application of paragraph (2)(B)," and that paragraph does not apply to non-annuity life insurance payments. 26 U.S.C. §§ 72(e)(5)(C), (e)(5)(A)(i).

The gross income calculated by the Tax Court was the amount by which the cash value of Brown's insurance policy exceeded what he'd paid for the policy. The fact that this income was used to pay a debt to the insurance company is irrelevant, because it was a personal rather than a business debt and therefore was not deductible. 26 U.S.C. § 61(a); 26 U.S.C. §§ 163(a), (h); *Kikalos v. Commissioner*, 190 F.3d 791, 793-94 (7th Cir. 1999). It is also irrelevant that no money changed hands—that the debt was paid by the creditor's withholding money otherwise due the debtor, like a setoff. See, besides the *Feder*, *Sanders*, and *McGowen* opinions cited above, *Barr v. Commissioner*, *supra*, 2009 WL 3617587, at *2, and *Atwood v. Commissioner*, No. 19748-97, 1999 WL 109617, at *2 (U.S. Tax Ct. Mar. 4, 1999).

The Tax Court's result may seem odd because it seems not to account for the cost that Brown (and the beneficiary of the life insurance policy, his wife) incurred when he was credited, upon cancellation of the policy, with the policy's cash surrender value. The cost incurred was the value of the death-benefit component of the

policy, which (obviously) evaporated when the policy was cancelled.

But the oddness is superficial. As time passes and the cash surrender value of a whole-life policy grows, the *net* death benefit, which is the face amount of the policy (the proceeds on death) minus the premiums paid, shrinks as a result of the growing stock of premiums paid, to the point at which further premium payments (which remember were fixed at $1,837 a year) can actually reduce the net death benefit. By surrendering the policy (albeit involuntarily) Brown gave up the prospect of receiving $100,000 if he died but at the same time freed himself from having to pay $1,837 each year to maintain that prospect.

It remains only to consider the penalty for the understatement of tax. The 20 percent penalty for substantial understatement of income tax, 26 U.S.C. §§ 6662(a), (b)(2), (d), has an exception for the case in which the taxpayer's position was supported by "substantial authority." § 6662(d)(2)(B)(i); see *Kim v. Commissioner*, 679 F.3d 623, 626 (7th Cir. 2012); *TIFD III-E, Inc. v. United States*, 666 F.3d 836, 848-50 (2d Cir. 2012). As defined with great specificity in a Treasury Regulation the validity of which is not challenged, the term "substantial authority" is limited to statutes, regulations, judicial decisions, congressional floor statements and committee reports, revenue rulings and procedures, tax treaties, private letter rulings, and certain IRS publications. Treas. Reg. § 1.6662-4(d)(3)(iii).

There is a compelling reason for limiting the eligible authorities as tightly as the regulation does: otherwise

demand by taxpayers would evoke "authorities" for every position that a taxpayer might wish to take. The authorities on which the taxpayers in this case rely either do not support their position or aren't on the list.

Even if there isn't substantial authority in support of a taxpayer's position, he can avoid the underpayment penalty if he made reasonable efforts to determine his tax liability. 26 U.S.C. § 6664(c); Treas. Reg. §§ 1.6662-4(a), 1.6664-4(b). Generally this requires that he have obtained an opinion from an accountant or lawyer. *United States v. Boyle*, 469 U.S. 241, 250-51 (1985); *Mulcahy, Pauritsch, Salvador & Co. v. Commissioner*, 680 F.3d 867, 872 (7th Cir. 2012). The taxpayers in this case are an attorney couple who made no effort to research the legal basis for their position, or obtain an opinion from an accountant or lawyer, until the Internal Revenue Service challenged their position. So they didn't reach the safe harbor.

AFFIRMED.