**PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b),THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.**

T.C. Summary Opinion 2013-81

UNITED STATES TAX COURT

JEFFREY J. FURNISH, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25690-11S.                          Filed October 23, 2013.

Jeffrey J. Furnish, pro se.

<u>Erik W. Nelson</u>, for respondent.

SUMMARY OPINION

GUY, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions

of section 7463 of the Internal Revenue Code in effect when the petition was

filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by

--------

[1]Section references are to the Internal Revenue Code (Code), as amended

(continued...)

any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency of $22,444.52 in petitioner's Federal income tax for 2009 and an accuracy-related penalty of $4,488.90 pursuant to section 6662(a). Petitioner filed a timely petition for redetermination with the Court pursuant to section 6213(a).

After concessions,[2] the issue remaining for decision is whether petitioner received a constructive distribution of $49,255.24 as reported by Northwestern Mutual Life Insurance Co. (NML) on Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.[3]

---

[1](...continued)
and in effect for 2009, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that petitioner is not liable for (1) so much of the deficiency as relates to an adjustment to itemized deductions of $492.55, and (2) an accuracy-related penalty under sec. 6662(a).

[3]Petitioner included the $49,255.24 that NML reported on Form 1099-R in his taxable income for 2009. Although respondent assessed the tax attributable to the Form 1099-R income, petitioner has not paid it. Respondent concedes that he erroneously added $49,255.24 to petitioner's taxable income a second time in computing the tax deficiency of $22,444.52.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the accompanying exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Oregon.

### I. Petitioner's Life Insurance Policies

Petitioner is an actuary. In 1972, at the age of 20 and while he was still a college student, petitioner purchased a "65 LIFE" insurance policy from NML (1972 policy). The 1972 policy provided a basic death benefit of $20,000 and required an annual premium payment of $340. Petitioner also agreed to pay $4.20 per year to NML for a waiver of the annual premium in the event of his disability and $27.17 per year for the option to purchase additional insurance without a further medical exam.

In 1974 petitioner purchased an "EXTRA ORDINARY LIFE" insurance policy from NML (1974 policy). The 1974 policy provided a basic death benefit of $35,000 and an additional death benefit of $15,000 for the first 34 years the policy remained in force. In addition to an annual premium of $462, petitioner agreed to pay $8.50 per year for a waiver of the annual premium in the event of his disability.

Both policies allowed petitioner to participate in any annual dividends that NML might declare. When petitioner applied for the policies, he elected to have NML dividends applied to purchase "fully paid-up" additional insurance.

Both policies offered petitioner the options of (1) obtaining policy loans from NML, and (2) paying annual premiums through premium loans from NML against the cash value of the policies. Both policies provided that policy and premium loans would accumulate compound interest at 6% annually.

Petitioner testified that he recalled paying at least four of the first seven annual premium payments due on the policies. Thereafter, he elected to pay the annual premiums through premium loans from NML. The parties did not offer any evidence regarding policy loans that petitioner obtained from NML.

The record includes a few of petitioner's annual policy statements. Petitioner's annual policy statements for the 1972 policy for 2006, 2008, and 2009 reflect the following:

|  | 2006 | 2008 | 2009 |
| --- | --- | --- | --- |
| Total death benefit | $65,229.00 | $70,123.00 | $72,431.00 |
| Total loans | 26,960.86 | 33,188.38 | 35,544.54 |
| Net death benefit | 38,268.14 | 36,934.62 | 36,886.46 |
| Total cash value | 30,292.61 | 34,669.47 | 36,897.98 |
| Net cash value | 3,331.75 | 1,481.09 | 1,353.44 |
| Dividends | 1,107.50 | 1,271.85 | 1,204.92 |

The annual policy statements summarized above uniformly indicate that petitioner's basic insurance coverage was $22,000, whereas the underlying life insurance policy indicates that petitioner's basic insurance coverage was $20,000.

Petitioner's annual policy statements for the 1974 policy for 2004, 2006, and 2009 reflect the following:

|  | 2004 | 2006 | 2009 |
|---|---|---|---|
| Total death benefit | $74,734.00 | $79,473.00 | $87,375.00 |
| Total loans | 27,310.19 | 31,713.11 | 40,220.59 |
| Net death benefit | 47,423.81 | 47,759.89 | 47,154.41 |
| Total cash value | 29,632.67 | 34,056.56 | 41,652.62 |
| Net cash value | 2,322.48 | 2,343.45 | 1,432.03 |
| Dividends | 979.54 | 1,202.49 | 1,326.55 |

In early 2009 NML sent written notification to petitioner that both insurance policies would lapse unless he made additional premium payments. Petitioner did not make any additional premium payments, and NML determined that the insurance policies had lapsed at that time.

II. Form 1099-R

NML issued to petitioner a Form 1099-R for 2009 reporting a gross distribution of $78,414.14 in respect of the two insurance policies, designating $49,255.24 as taxable income.

III.  Petitioner's Tax Return

On or about August 16, 2010, petitioner submitted to the Internal Revenue Service (IRS) two Forms 1040, U.S. Individual Income Tax Return, for 2009, along with a written statement.  Return "A" did not include the income reported by NML on Form 1099-R, whereas petitioner reported the income on return "B".  Petitioner's written statement described the events leading to the lapse of the insurance policies and the issuance of Form 1099-R and set forth his claim that it would be unfair to impose income tax on what he considered an artificial distribution.  The IRS accepted and filed petitioner's return "B" and assessed the tax reported on that return.

IV.  Subsequent Developments

In late October 2010 petitioner contacted NML and requested a statement confirming that he did not receive a cash distribution from NML when his insurance policies lapsed.  NML responded to petitioner's request by letter dated November 1, 2010, stating:

Dear Mr. Furnish:

Thank you for the opportunity to address your questions about the taxable gain on your policy.  The taxable amount occurred when your policies lapsed to an Extended Term insurance contract and the outstanding loan balances were repaid.

Federal laws define most life insurance distributions as a taxable * * * [event] once the cost of insurance has been recovered. When a policy lapses to Extended Term, cash value is released from the policy to repay the loans. To the extent that loans paid off exceed the cost of the insurance, a taxable event takes place. If a policy has a gain, it's considered taxable as ordinary income and we must report it in the year the policy terminates for any reason, other than the death of the insured.

Determining taxable gain is a two-step process. First, we determine the policy's cost basis. Here's the calculation for * * * [the 1972] policy:

| | |
|---|---|
| [1]Total premiums | $12,753.40 |
| [2]Total dividends | -0.00 |
| Cost basis | $12,753.00 |

[1]Total premiums include premiums for basic insurance coverage only. Premiums paid for additional benefits like waiver of premium and accidental death benefit aren't included.

[2]Total dividends are dividends used for purposes other than purchasing additional paid-up insurance. Examples of other purposes would be dividends used for loan repayment, premium reduction or received in cash.

Next, we compare the paid off loan amount less the cost basis. Here's the calculation for * * * [the 1972] policy:

| | | | |
|---|---|---|---|
| Policy Loan | $11,433.36 | Paid Off Loan Amount | $36,767.33 |
| Premium Loan | +$25,333.97 | Cost Basis | $12,753.40 |
| | $36,767.33 | | $24,013.93 |

Here are the calculations for * * * [the 1974] policy:

* * * * * * *

| Policy Loan | $ 7,993.26 | Paid Off Loan Amount | $41,646.81 |
|---|---|---|---|
| Premium Loan | +$33,653.55 | Cost Basis | $16,405.50 |
| | $41,646.81 | | $25,241.31 |

> I hope I've answered your questions regarding the taxable gain on your policy. Because I'm not in a position to advise you on tax matters, you may want to discuss this issue with an attorney, accountant or the IRS if you have further tax questions.

Petitioner responded to NML's letter with a request for clarification. NML responded to petitioner by letter dated November 8, 2010, repeating verbatim the statements contained in the November 1, 2010, letter but adding the following statement:

> At the time the policy lapsed to Extended Term Insurance in 1999, any remaining cash value in the policy provided insurance coverage until March 19, 2010, for * * * [the 1974 policy], and June 4, 2010 for * * * [the 1972 policy]. There were no cash values paid to the policyowner in 2009 because loans and unpaid loan interest depleted cash values causing the lapse to Extended Term Insurance.

On December 1, 2010, petitioner wrote to an IRS office in Fresno, California (presumably an examination unit), stating that he questioned NML's calculations underlying the Form 1099-R and that NML had declined to provide him with a "history of distributions" under his insurance policies because its electronic records went back only to the mid-1990s and the company was unwilling to do the research necessary to fully respond to his request.

During the next several months petitioner engaged in discussions with various IRS personnel in an effort to resolve the matter in his favor. In September 2011 petitioner attempted to obtain the assistance of the Taxpayer Advocate Service.

## V. Notice of Deficiency

On August 12, 2011, respondent issued to petitioner the notice of deficiency in dispute. Respondent determined in relevant part that it was appropriate to include the NML distribution in petitioner's income and that, as a consequence, he was liable for alternative minimum tax.

## VI. Petition

Petitioner filed a timely petition for redetermination asserting that he should not be subject to Federal income tax in respect of NML's "phantom" distribution of $49,255.24. He also expressed disappointment that he was not given an opportunity to discuss the matter with the IRS Office of Appeals.[4]

---

[4]Petitioner nevertheless wrote a letter to the IRS Office of Appeals dated August 13, 2012, asserting that he did not receive a distribution from NML, summarizing his efforts to obtain from NML detailed calculations underlying the Form 1099-R, and expressing doubts about the accuracy of NML's calculations supporting its determination that his policies had lapsed during 2009.

VII. NML Declaration

The record includes a declaration executed by Carol A. Stilwell, NML's director of policyowner services and a custodian of the company's business records. Ms. Stilwell's declaration states that petitioner's 1972 and 1974 policies terminated on June 4 and March 19, 2010, respectively, with no value. Ms. Stilwell attached to her declaration separate exhibits which provide the same narrative statements and calculations in respect of petitioner's insurance policies that appeared in NML's letter to petitioner dated November 1, 2010.

Discussion

The term "gross income" is broadly defined in the Code to include all income from whatever source derived. Sec. 61(a). An amount received in connection with a life insurance contract which is not received as an annuity generally constitutes gross income to the extent that the amount received exceeds the investment in the insurance contract. Sec. 72(e)(1)(A), (5)(A), (C); Brown v. Commissioner, 693 F.3d 765, 768 (7th Cir. 2012), aff'g T.C. Memo. 2011-83; Sanders v. Commissioner, T.C. Memo. 2010-279. The investment in the contract is defined as the aggregate amount of premiums or other consideration paid for the contract less aggregate amounts previously received under the contract to the extent they were excludable from gross income. Sec. 72(e)(6).

When NML determined that petitioner's insurance policies had lapsed, it applied the cash values of the policies to the outstanding balances on petitioner's loans. As we have explained in numerous cases, the act of applying the cash value of a life insurance policy against an outstanding loan is not different from distributing the proceeds to the taxpayer (including the untaxed inside buildup) to permit the taxpayer to use the proceeds to pay off the loan. See Feder v. Commissioner, T.C. Memo. 2012-10, 2012 WL 75114, at *4 (and cases cited threat).

A preliminary issue in this case, however, is whether NML correctly determined that petitioner's insurance policies had lapsed in 2009. As a general rule, the taxpayer bears the burden of showing that the Commissioner's determination is in error. Rule 142(a). As an exception to this general rule, if a taxpayer raises a reasonable dispute with respect to a third-party information return (such as the Form 1099-R in dispute) and has otherwise fully cooperated with the Commissioner, the burden of production may shift to the Commissioner

to present reasonable and probative evidence to verify the information return. Sec. 6201(d).[5]

Petitioner contends that he fully cooperated with respondent, that there are legitimate questions regarding the accuracy of NML's determination that his insurance policies lapsed in 2009, and that he tried but failed to persuade NML to produce the records necessary to verify and substantiate the information reported in the Form 1099-R. Petitioner asserts that he cannot be certain that his insurance policies actually lapsed in 2009 without detailed records showing the amounts of premium loans, the interest computations related to those loans, and NML's dividend distributions over the life of the policies--yet NML refused to produce those records. Petitioner further contends that NML's letters and annual policy statements raise more questions than they answer. Specifically, petitioner notes that (1) NML's annual policy statements for the 1972 policy make reference to

---

[5]Sec. 6201(d) provides:

In any court proceeding, if a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed with the Secretary * * * by a third party and the taxpayer has fully cooperated with the Secretary (including providing, within a reasonable period of time, access to and inspection of all witnesses, information, and documents within the control of the taxpayer as reasonably requested by the Secretary), the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return.

basic insurance coverage of $22,000, in contradiction of the 1972 policy which provides for basic insurance of $20,000, (2) there is no explanation for the seemingly anomalous decrease in the net cash value of the 1972 policy from $3,331.75 in 2006 to $1,481.09 in 2008, and (3) NML's letter to him dated November 8, 2010, erroneously stated that his insurance policies "lapsed to Extended Term Insurance in 1999".[6] Petitioner maintains that, considering all the circumstances, the burden of production shifted to respondent under section 6201(d), and respondent failed to meet his burden under that provision of law.

Respondent contends that petitioner has not raised a reasonable dispute in respect of the accuracy of the Form 1099-R. Specifically, respondent asserts that "[b]y petitioner's own admission, long-term computations such as these can be complex and difficult to verify in exacting detail without access to copious records. However, taken on the whole, the computations provided by * * * [NML] follow a logical pattern explaining petitioner's situation."

Contrary to respondent's position, petitioner raised a reasonable dispute regarding the accuracy of the Form 1099-R. Although petitioner points to relatively minor discrepancies in NML's records, we agree with petitioner that the

---

[6]The record is clear that NML had determined that petitioner's insurance policies had lapsed in 2009.

discrepancies are of such a nature that their cumulative effect, compounded over the extended terms of the policies in question, would likely be significant and could very well alter the dates that the insurance policies lapsed.

Respondent also avers that petitioner "did not bring these alleged errors to respondent's attention until the day of the trial." The burden of production shifts to the Commissioner under section 6201(d) only if the taxpayer fully cooperates with the Commissioner by providing, within a reasonable period, access to and inspection of all witnesses, information, and documents within the control of the taxpayer as reasonably requested. Respondent did not present any evidence that petitioner failed to respond to reasonable requests for information. Considering petitioner's detailed communications with IRS personnel before and after the notice of deficiency was issued and the fact that he apparently was not given the opportunity to discuss the matter with the Appeals Office, we conclude that petitioner fully cooperated with respondent within the meaning of section 6201(d).

As a final matter, respondent contends that he produced "reasonable and probative information" in support of the Form 1099-R. We disagree. Aside from the documents that the parties agreed to submit to the Court by way of stipulation, most of which came from petitioner, the only information that respondent offered was Ms. Stilwell's declaration. That declaration merely restates the summary

information that NML provided to petitioner in its letters dated November 1 and 8, 2010. The declaration does nothing to assuage doubts surrounding the accuracy of the Form 1099-R.

In sum, on the record presented, we conclude that the burden of production shifted to respondent under section 6201(d), and respondent failed to produce reasonable and probative information regarding the accuracy of the Form 1099-R in dispute. Unlike his approach in similar cases, see Feder v. Commissioner, T.C. Memo. 2012-10; Sanders v. Commissioner, T.C. Memo. 2010-279, respondent did not obtain detailed records of petitioner's premium payments and loan history to corroborate NML's Form 1099-R in the face of legitimate questions as to its accuracy. Absent such information, there is insufficient evidence to verify that petitioner received the constructive distribution of $49,255.24 that NML reported to respondent or to otherwise sustain the deficiency in dispute.

To reflect the foregoing,

Decision will be entered

under Rule 155.